UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BENJAMIN R. DAVIS,

       Plaintiff,

v.

CRAIG DELEON, LEGACY RIM, and
LEGACY DMC,

       Defendants.

Case No. 13-15056

Hon. Patrick J. Duggan

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

This is an employment discrimination case arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Michigan Compiled Laws § 37.2101, *et seq.* Plaintiff Benjamin R. Davis worked as a rehabilitation trainer at the Brasza Fitness Center at the Detroit Medical Center ("DMC"), which is located at the Rehabilitation Institute of Michigan ("RIM"), from May 7, 2012 until his termination on March 8, 2013. Plaintiff contends that Defendants Craig DeLeon, Legacy RIM (a/k/a Rehabilitation Institute of Michigan), and Legacy DMC (a/k/a Detroit Medical Center) discriminated against him on account of his gender and because he formerly served in the United States military.

Plaintiff exhausted his administrative remedies by filing a charge of discrimination with the Michigan Department of Civil Rights ("MDCR") and filed a timely complaint with this Court on December 12, 2013.  Presently before the Court is "Defendants' Motion to Dismiss Based on the Pleadings and for Summary Judgment," filed pursuant to Federal Rules of Civil Procedure 12(c) and 56 on July 17, 2014.[1]  The matter has been fully briefed and the Court held a motion hearing on October 1, 2014.  For the reasons stated herein, the Court grants Defendants' Motion.

## I.      BACKGROUND

### A.    Factual Background

On March 26, 2012, Defendant DeLeon, a male with managerial responsibilities, interviewed Plaintiff, a male, for a rehabilitation trainer position at the DMC Fitness Center located in Detroit, Michigan.[2]  This position opened as a result of the resignation of Tiffany Grubaugh, a female trainer.

On April 9, 2012, DeLeon hired Plaintiff to replace Ms. Grubaugh. Plaintiff's employment became effective on May 7, 2012.  Although initially hired as a part-time employee, Plaintiff was later moved to a full-time position.

---

[1] Typically, motions filed pursuant to Rule 12(c) are referred to as motions for judgment on the pleadings.

[2] Despite the use of "rehabilitation" in the job title, and the fact that the job was affiliated with a large health system, a rehabilitation trainer is distinct from a physical therapist.

(Interview Notes & Selected Applicant Form, Defs.' Mot. Ex. 4; DeLeon Dep. Tr.
57, 135-36, Pl.'s Resp. Ex. 10; Pl. Dep. Tr. 67, Pl.'s Resp. Ex. 8.)

Plaintiff shadowed Ms. Grubaugh and another rehabilitation trainer for four
days prior to taking over Ms. Grubaugh's clients. (Pl. Dep. Tr. 76-77.) A job
posting summary of the rehabilitation trainer position describes one of the job
duties as "provid[ing] appropriate assessment/documentation of patient
progress[.]" (Job Posting Summary, Defs.' Mot. Ex. 7.[3]) Plaintiff testified that he
never saw Ms. Grubaugh fill out any paperwork while he shadowed her; however,
he did acknowledge that Ms. Grubaugh showed him "a lot of forms." (Pl. Dep. Tr.
77.) These forms refer to workout summary forms, which, while different in
format, are all designed to aid in the documentation of client workouts and
progress. In an affidavit, Ms. Grubaugh states that she does not recall informing
Plaintiff that he was required to fill out any forms or that proper completion of the
forms was a duty of the position. (Grubaugh Aff. 2, Pl.'s Resp. Ex. 5.) While
Plaintiff makes much of the fact that he never received instruction regarding the
forms, during his deposition, Plaintiff affirmatively stated that proper
documentation of client progress was a requirement of the job. (Pl. Dep. Tr. 93.)

---

[3] This document was created after Plaintiff was hired, as evidenced by a
creation date of October 16, 2012 on the bottom right corner of the document.
During his deposition, however, Plaintiff acknowledged that proper documentation
of client progress was, in fact, a job requirement. (Pl. Dep. Tr. 93.)

Defendants contend that DeLeon, Plaintiff's direct supervisor, met with Plaintiff in June 2012 regarding Plaintiff's inadequate documentation of client progress.  During his deposition, Plaintiff testified that he could not recall whether this meeting occurred.  At some point during Plaintiff's employment, Plaintiff and DeLeon agreed that Plaintiff could use his iPad, a personal tablet, to organize workouts for clients, but that he needed to also document progress using department forms for the Fitness Center's records.

With the exception of the June 2012 meeting, it appears that Plaintiff's first several months of employment proceeded smoothly, that is, until November 2012. In November, Plaintiff made a statement to two front desk employees implying that another co-worker, a female named Mary Thompson, had accused them of stealing money.  (*Id.* at 102-05.)  This comment exacerbated tension that previously existed between various Fitness Center staff members.  (*Id.* at 107.)  As a result, a staff meeting was held and all employees involved in the incident were required to participate in the Employee Assistance Program ("EAP").  (*Id.* at 112.) Soon after the incident, Plaintiff sent DeLeon an email apologizing for "starting this fire[.]"  (*Id.* at 114; *see also* 11/6/12 Email, Defs.' Mot. Ex. 9.)

Between the November incident and early January, DeLeon discovered other performance issues related to Plaintiff.  On January 7, 2013, DeLeon wrote Plaintiff a "Letter of Disappointment."  (1/7/13 Letter, Defs.' Mot. Ex. 10.)   The

4

November 2012 incident described above was not referenced in the letter.  The

letter – which was used to express disappointment with Plaintiff's performance –

cited issues regarding Plaintiff's failure to notify his colleagues when he left the

work area, about being late for appointments, and about referring a client to a

competitor.[4]  (*Id.*)  The letter also states that DeLeon "reviewed a client file . . .  in

response to a telephone call from the client's wife.  Upon review, it is evident that

you have not been keeping current with your progress notes for the above said

client." (*Id.*)  The letter concluded by reminding Plaintiff that his employment was

"expressly at-will" and that employees "may be terminated for continued failure to

meet the expectations of their positions, violations of policies and procedures, or

for any other reason or no reason at all." (*Id.*)  DeLeon met with Plaintiff about the

letter, which he read to Plaintiff and Plaintiff signed.  (Pl. Dep. Tr. 125.)  DeLeon

told Plaintiff that the letter "wasn't a big deal.  It wasn't punishment." (*Id.* at 129.)

 After issuance of the Letter of Disappointment, additional issues regarding

Plaintiff's performance arose.  On March 4, 2013, approximately three months

after writing the Letter of Disappointment, DeLeon sent an email to RIM Vice-

President Patti Jobbitt and Human Resources employee Regina Floyd setting forth

---

[4] Much attention has been focused on whether Plaintiff knew he referred a
client to a competitor.  Both sides agree that Plaintiff did not intentionally engage
in wrongdoing.  Plaintiff does acknowledge, however, that the services his client
wanted were available through the Fitness Center, DMC, and/or RIM.

5

his belief that Plaintiff should be terminated from his position as a rehabilitation

trainer.  The email provides:

> Attached is a letter of disappointment that was issued on January 7th.
> As you will see in the letter there were several issues that were
> addressed, including improper/poor documentation of client files and
> notes, leaving the work area without notice, and referring business to
> outside competition.
>
> Since the letter of disappointment I have found the employee to be
> falsifying productivity and training members that either are not paying
> for training, or extending their sessions beyond the allotted time
> billed/paid for[.]  There has [sic] also been ongoing issues related to
> the employee's adherence with documenting group exercise class
> attendance.  His solution, as you will see in additional documents
> (email) was not to teach classes altogether if he could not do
> department policy his way.
>
> He was also scheduled to attend a training session on February 4th,
> which he was notified for in our 1/15/13 staff meeting.  He notified
> me on February 1st that he had class that day and could not attend.
> This training session was paid for by DMC ahead of training ($400)
> and therefore went to waste.
>
> Please let me know if there is any other information needed.  I would
> like to do the separation this Friday . . . .

(3/4/13 Email, Defs.' Mot. Ex. 15.)  The issues raised in this email are addressed

below.

In early March 2013, DeLeon learned that Plaintiff was regularly reporting

in a productivity log that he had spent more time with clients than he was supposed

to based on their scheduled appointment times.  Plaintiff admits spending more

time with his clients than the scheduled appointment times would permit, but

6

asserts that his female counterparts did as well, and that their productivity logs were never reviewed.  (Pl.'s Resp. 3 (citing Szaroleta Aff.).)

With respect to the documentation of group exercise classes, toward the end of February 2013, a co-worker sent Plaintiff an email asking him to write down the size of his group exercise classes in a group productivity log located in "Studio 1." In response, Plaintiff indicated that his schedule was hectic around the group class sessions and proposed making his own form to keep track of the number of people attending his classes.  Plaintiff also indicated that he was "more than ok [sic] not teaching classes as well, if this compromise makes you feel like you are losing your locus of control."  (2/20/13 Email, Defs.' Mot. Ex. 13.)  DeLeon, who had been copied on all of the emails, responded that the log was required to accurately report the numbers and that he was not interested in having multiple logs.  (*Id.*) DeLeon also indicated that teaching group exercise classes was not optional for rehabilitation trainers.  (*Id.*)

The last incident DeLeon documented in his email pertained to a smoking cessation workshop that Plaintiff was scheduled to attend to learn various techniques to assist his clients in quitting smoking.  Plaintiff does not dispute that he cancelled a few days before the workshop.  (Pl. Dep. Tr. 156-61; *see also* Email Exchanges, Defs.' Mot. Ex. 12.)  Plaintiff does, however, point to evidence that Ms. Szaroleta once "no showed" at a similar event.  (Szaroleta Aff. 4.)

7

Four days after DeLeon recommended Plaintiff's termination, DeLeon drafted a letter informing Plaintiff that "[s]ince receiving the letter of disappointment you have failed to meet the required expectations of the job." (3/8/13 Letter, Defs.' Mot. Ex. 16.)  The letter then informs Plaintiff that his employment will be terminated effective immediately.  (*Id.*)  At a meeting discussing the contents of the termination letter, at which Ms. Floyd and Ms. Jobbitt were present along with DeLeon and Plaintiff, Plaintiff raised concerns and another meeting was scheduled for March 13, 2013.

Subsequent to the termination meeting, Ms. Floyd reviewed various client files kept by Plaintiff and found the documentation in the files to be deficient.  Ms. Floyd also reviewed five files for each of the various female rehabilitation trainers to see if they were adequately documenting client progress, and determined that they were.  (*See generally* Floyd Post-Termination Mem., Defs.' Mot. Ex. 17; Floyd Dep. Tr. 23-28, 37, 44, Pl.'s Resp. Ex. 12.)

To fill the vacancy created by Plaintiff's termination, another white male was hired.  (DeLeon Dep. Tr. 57, 135.)  The replacement was hired after Defendants were apprised that Plaintiff had filed a charge of discrimination.

On March 26, 2013, Plaintiff filed a charge of discrimination with the MDCR.  (Charge of Discrimination, Defs.' Mot. Ex. 18.)  When a charge is filed with the MDCR, the charge is automatically filed with the Equal Employment

Opportunity Commission ("EEOC").  The charge contains complaints of

discrimination on the basis of sex and disability.  After a preliminary investigation

of Plaintiff's claims, the EEOC mailed Plaintiff a letter of dismissal and notice of

rights on September 27, 2013, informing Plaintiff of his right to file a lawsuit

within ninety days of his receipt of the notice.  (Right to Sue Letter, Defs.' Mot.

Ex. 19.)

## B.    Legal Proceedings

Plaintiff instituted the present action on December 12, 2013.  Plaintiff's

Complaint contains two counts: Count I: Title VII – Reverse Discrimination; and

Count II: Elliott-Larsen Violation.  Despite containing only these two counts,

Plaintiff's Complaint also makes several references to veteran status discrimination

and disability discrimination pursuant to the Americans with Disabilities Act

("ADA").[5]

Defendants answered Plaintiff's Complaint on February 21, 2014.  On July

17, 2014, having completed discovery, Defendants filed a motion for judgment on

the pleadings and for summary judgment pursuant to Federal Rules of Civil

Procedure 12(c) and 56.  Plaintiff responded on August 7, 2014, and Defendants

replied on August 19, 2014.

---

[5] Plaintiff's charge of discrimination included a claim of disability
discrimination.

9

The Court held a motion hearing on October 1, 2014.  At this hearing, Plaintiff's counsel informed the Court that he was withdrawing the disability discrimination claim.  Therefore, Plaintiff's claims of reverse sex discrimination and veteran status discrimination are the only claims remaining.

## II.   GOVERNING LEGAL STANDARDS

### A.   Judgment on the Pleadings

Federal courts review motions for judgment on the pleadings brought pursuant to Federal Rule of Civil Procedure 12(c) using the standards applicable to motions filed under Rule 12(b)(6).  *Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 846 (6th Cir. 2012).  Though litigants employ these procedural mechanisms at different stages of the proceedings, the purpose of both motions is to test the legal sufficiency of a plaintiff's pleadings.  Thus, as with Rule 12(b)(6) motions, a Rule 12(c) motion allows a court to make an assessment as to whether a plaintiff has stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

### B.   Summary Judgment

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quotation omitted).

## III.   ANALYSIS

### A.   Veteran Discrimination

Defendants contend that the Court should dismiss Plaintiff's claims of discrimination relating to his veteran status pursuant to Federal Rule of Civil Procedure 12(c).  The Court agrees, as Plaintiff's Complaint does not provide any statutory basis for his claim that he was discriminated against on the basis of his military service, and neither Title VII nor the ELCRA includes veteran status as a protected class.[6]  Because Plaintiff's arguments regarding veteran discrimination fail to state a viable claim under the statutes cited in the Complaint, the Court dismisses Plaintiff's claims of veteran status discrimination.

### B.   Reverse Sex Discrimination

Plaintiff claims that he was a victim of reverse sex discrimination in contravention of Title VII and the ELCRA.  42 U.S.C. § 2000e-2(a); Mich. Comp. Laws § 37.2202(1)(a).  The crux of Plaintiff's claim is that he was treated more harshly than his female counterparts who engaged in similar conduct.

---

[6] Race, color, religion, sex, and national origin are protected classes under Title VII.  42 U.S.C. § 2000e-2(a).  The ELCRA is more protective and includes religion, race, color, national origin, age, sex, height, weight, or marital status. Mich. Comp. Laws § 37.2202(1)(a).

11

To survive summary judgment, Plaintiff must adduce direct or circumstantial evidence of unlawful discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Because Plaintiff has not pointed to any direct evidence of sex-based discrimination, but rather relies on circumstantial evidence, the familiar burden-shifting framework enunciated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973) governs his claims of reverse sex discrimination under both Title VII and the ELCRA. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (noting that courts apply the same analysis to both Title VII and ELCRA claims). This framework aids courts in resolving "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment[,]" that is, "whether the plaintiff was the victim of intentional discrimination." *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 824 (E.D. Mich. 2009) (citation omitted).

Under *McDonnell Douglas*, a plaintiff must first make out a prima facie case of discrimination, after which the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory explanation for the adverse employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252, 101 S. Ct. 1089, 1093 (1981) (citation omitted); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997). If the employer discharges its burden, the inference of discrimination raised by the prima facie case ceases to exist and the plaintiff must

12

then demonstrate that the employer's proffered explanation is a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2016 (2000); *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012).

The Court concludes that Plaintiff has failed to establish a prima facie case of discrimination. In the alternative, the Court finds that Plaintiff has failed to point to evidence creating a genuine issue of material fact with respect to whether his termination was merely a pretext for unlawful gender discrimination.

**1.     *Plaintiff has not discharged his burden of demonstrating a prima facie case of unlawful sex discrimination.***

The first step in the tripartite framework set forth in *McDonnell Douglas* requires a plaintiff to establish a prima facie case of class-based discrimination. This typically requires a plaintiff to show (1) membership in a protected class, (2) that he was qualified for the position, (3) that he suffered an adverse employment action, and (4) that he was treated differently than similarly situated, non-protected employees. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). "However, in so-called reverse-discrimination cases [brought pursuant to Title VII], where a member of the majority group claims discrimination, [the Sixth Circuit has] modified the first and fourth prongs of the traditional prima facie test." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569 (6th Cir. 2009) (citation omitted). The first element of the modified prima facie framework requires a

13

plaintiff to "demonstrate 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (alteration in original) (quoting *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002)). "To satisfy the fourth prong in such cases, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Id.* (citation omitted). Notably, a plaintiff alleging gender discrimination under the ELCRA need not satisfy this modified approach.[7] *Lind v. City of Battle Creek*, 470 Mich. 230, 681 N.W.2d 334 (2004).

For purposes of the present motion, the Court is willing to assume that Plaintiff has satisfied the first three elements of the prima facie framework. Plaintiff has not, however, sufficiently discharged his burden with respect to the

---

[7] Although the Michigan Supreme Court held in *Lind* that requiring a member of a majority group to make a different showing than a member of a minority group imposed an impermissible gender-based distinction under the ELCRA, the Sixth Circuit has "expressly cautioned against letting" the "modifications" to the traditional prima facie test "'impermissibly impose a heightened pleading standard on majority victims of discrimination.'" *Simpson*, 359 F. App'x at 569 (quoting *Zambertti*, 314 F.3d at 257 and citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n.7 (6th Cir. 1994) ("We have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts.")).

fourth element because Plaintiff has failed to provide adequate evidence of a similarly situated female employee who was treated more favorably.

Plaintiff contends that he was similarly situated to Ms. Szaroleta, another former rehabilitation trainer who was supervised by DeLeon. Relying on her affidavit, Plaintiff points out that Ms. Szaroleta "often did not fill out forms and had missed appointments and misstated items on [her] productivity logs," but was never "disciplined for this, nor the subject of any document review or meetings." (Szaroleta Aff. 4.) Further, she one time failed to show up for a training workshop. Although she received an "Event Occurrences" notice in her file as a result of missing the event, Ms. Szaroleta contends that this notice was not "discipline of any sort[.]" (*Id.*)

With respect to Ms. Szaroleta's documentation of client progress, there is no indication of how "often" she neglected to fill out forms. Documentary evidence submitted by Defendants shows that Ms. Szaroleta did, in fact, fill out client progress notes on a regular basis. (Szaroleta Progress Notes, Defs.' Reply Ex. 5.) While a review of the exhibit reveals that there were a few instances in which the progress notes were left blank, for example, for a client named "Jenn" on June 17, 19, and 20, 2013, most of the forms contain a description of the various workouts performed for each client on each day they trained with Ms. Szaroleta. (*Id.*) In other words, it appears that Plaintiff had several more missing progress notes for

15

his various clients than did Ms. Szaroleta, which explains why DeLeon never disciplined Ms. Szaroleta for not filling out the forms.[8]  (DeLeon Dep. Tr. 59.)

In *Simpson*, the Sixth Circuit rejected a claim by a male nurse who argued that his employer, a university hospital, engaged in reverse sex discrimination, pointing out that the plaintiff's "failure to chart four patients [was] more egregious on its face than [his comparator's] alleged failure to chart one patient."  359 F. App'x at 569.  Because the plaintiff's violation of hospital charting policy was "more egregious" than his comparator's alleged violation, plaintiff's employer was permitted to sanction the plaintiff more severely.  *Id.*  This logic applies with equal force to the circumstances presented here.

Bolstering the Court's conclusion that the amount of missing client notes impacted the nature of Plaintiff's sanction is the fact that Plaintiff attached several of his own client progress notes to his Response.  These progress notes, filled out on various forms supplied by the Fitness Center, have been submitted to demonstrate that Plaintiff did, in fact, keep adequate client records.  However, it was brought to this Court's attention that the produced notes were kept and stored on Plaintiff's personal iPad.  These notes were not located until sometime after Plaintiff's termination, were never provided to Defendants to refute any

---

[8] The Court notes that prior to the January Letter of Disappointment, DeLeon received a call from the wife of one of Plaintiff's clients, prompting DeLeon to review the file of that client.  Upon review, DeLeon noticed that the progress notes were not current.

accusations that he was not properly documenting client workouts, and were produced to Defendants only after the close of discovery.  Even if Plaintiff was keeping the progress notes on his iPad, he was told that he had to complete the client progress notes for the Fitness Center's records.  Given that many of these progress notes were produced after the close of discovery, it appears that Plaintiff's documentation of client workouts was less complete than Ms. Szaroleta's, at least to those lacking access to Plaintiff's personal iPad.  This is significant given Plaintiff's admission during his deposition that proper documentation of client progress was one of the duties of rehabilitation trainers.  (Pl. Dep. Tr. 93.)  It is also significant because "[an] employer's more severe treatment of more egregious circumstances simply cannot give rise to an inference which would support the establishment of a prima facie case of discrimination." *Simpson*, 359 F. App'x at 569 (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002)).

Plaintiff further points to the fact that, like him, Ms. Szaroleta, went over her scheduled client appointment times, yet no one reviewed her "productivity logs" or otherwise disciplined her for so doing so.  Ms. Szaroleta's affidavit indicates that "[t]here were many, many times when I went over the time limit for training a patient and put down .75 when I actually spent an hour with [the] patient, but I was never disciplined nor advised that this was improper."  (Szaroleta Aff. 3.)  The Court notes that this is not what Plaintiff was doing, as he was marking down the

17

actual amount of time that he spent with clients.  Using the numbers provided in

Ms. Szaroleta's affidavit, if Plaintiff had a forty-five minute appointment (".75")

but actually spent an hour with the client, he would not write ".75" into his

productivity log, but rather would write "1.0."  While it is indeed unfortunate that

honestly recording time spent with clients raised concerns for DeLeon, the females

who incorrectly reported their time escaped detection.  This is particularly true

given that DeLeon's job required him to travel, such that he was not always on site

at the Fitness Center.

    Lastly, Plaintiff also notes that Ms. Szaroleta once "no showed" at a training

session, while he informed DeLeon prior to the smoking cessation workshop that

he would not be able to attend.[9]  (Szaroleta Aff. 4.)  Although Ms. Szaroleta says

that she was not disciplined for missing the event, she does reference a letter

placed in her file regarding the event.  While she may not have viewed the letter as

disciplinary, DeLeon testified during his deposition that "[t]here was one discipline

discussion I had with Erin Szaroleta over her course of employment."  (DeLeon

Dep. Tr. 59.)  While DeLeon did not recommend that Ms. Szaroleta be terminated

---

[9] Although not raised in the parties' briefs, at oral argument, Plaintiff's counsel noted that after Plaintiff emailed DeLeon to tell him he would not be able to attend the smoking cessation workshop due to his class schedule, DeLeon responded by simply indicating that he would remove Plaintiff from the list of attendees.  DeLeon did not otherwise expressly indicate that the cancellation was a problem but, in his email to Ms. Jobbitt and Ms. Floyd recommending Plaintiff's termination, DeLeon referenced the workshop cancellation as one of the reasons that he believed termination was proper.

as a result of missing a training workshop, the record reveals that Ms. Szaroleta had fewer issues during her employment than Plaintiff did and that termination may not have been the appropriate course of conduct given that she had one documented performance issue at that time.

In short, although Ms. Szaroleta admits to engaging in some of the same acts that ultimately led to Plaintiff's termination, her admissions do not make the two similarly situated. "To be deemed similarly-situated, the individuals with whom the plaintiff seeks to compare his treatment must have . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Nishi v. Siemens AG*, 290 F. Supp. 2d 772, 782 (E.D. Mich. 2003) (citations and internal quotation marks omitted). In addition to the differences between the conduct of Plaintiff and Ms. Szaroleta highlighted above, there is no indication that Ms. Szaroleta had ever been suspected of recommending a client to a competitor, that Ms. Szaroleta ever had issues documenting attendance at group exercise classes or that she ever suggested that she would start her own log instead of following the protocol of recording all attendance numbers in one place, or that she had been the recipient of a letter of disappointment. Ms. Szaroleta is therefore not an appropriate comparator for purposes of the prima facie test and Plaintiff has failed

19

to establish that Defendants treated him differently than similarly situated female employees.[10]

## 2.   *Plaintiff has failed to present any evidence that his discharge was a pretext for unlawful sex discrimination.*

Even assuming that Plaintiff presented sufficient evidence to establish a prima facie case of discrimination, Defendants have set forth a legitimate, nondiscriminatory reason for terminating Plaintiff, namely, that Plaintiff had multiple documented performance issues.  Once an employer offers a legitimate and nondiscriminatory reason for the adverse employment action – here, that Plaintiff was not satisfactorily discharging the duties of the rehabilitation trainer position – the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's proffered explanation is merely a pretext for discrimination.  *Reeves*, 530 U.S. at 142-43, 120 S. Ct. at 2106; *Blizzard*, 698 F.3d at 285.  This requires that the employee produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him]."  *Blizzard*, 698 F.3d at 285 (first alteration in original); *Griffin*

---

[10] To the extent that Plaintiff argues that Mary Thompson, the woman who made allegedly racist comments that Plaintiff then repeated to workers at the front desk in November of 2012, was treated more favorably than he was, it is undisputed that all employees even tangentially involved in the incident, including Plaintiff and Ms. Thompson, were required to participate in the Employee Assistance Program ("EAP").  Further, there is nothing in the record supporting Plaintiff's contention that the two were similarly situated as there is no evidence that Ms. Thompson had multiple documented performance issues during her employment.  Therefore, Ms. Thompson is not an appropriate comparator either.

*v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) ("[T]o survive summary judgment, a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not disprove, the defendant's proffered rationale.") (quotation omitted).  Plaintiffs are not typically "required to also produce evidence that discrimination was the real reason for the adverse employment action." *Philbrick v. Holder*, No. 13-2569, 2014 U.S. App. LEXIS 18017, at *8 (6th Cir. Sept. 16, 2014) (unpublished) (citing *Griffin*, 689 F.3d at 593 and *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) ("[W]e do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.") (internal quotation marks omitted)).  However, there are cases "where 'although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.'"  *Id.* at *24 (quoting *Reeves*, 530 U.S. at 148, 120 S. Ct. at 2109). Such circumstances occur where an employee has failed to raise jury question on the ultimate issue in employment discrimination cases, that is, whether "discrimination was the real reason[]" for the adverse employment action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993) (emphasis in original).

A plaintiff-employee has multiple avenues available to rebut an employer's proffered justification for an adverse employment action; for instance, by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the discharge], or (3) that they were insufficient to warrant the [discharge]." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). These considerations "need not be applied rigidly[; r]ather, 'pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard*, 698 F.3d at 285 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

Plaintiff focuses on refuting the factual basis for the various justifications proffered by Defendants for the termination, and even one event that was never provided as a reason for Plaintiff's discharge.[11]  (Pl.'s Resp. 19-21.)  However, Plaintiff does not dispute that many of the events occurred.  Although Plaintiff argues that he did fill out the client progress notes, he failed to apprise this Court that the client progress notes attached to his Response were not produced to

---

[11] Plaintiff argues that there was "no basis in fact for the termination of the Plaintiff based upon the event of November 2012." (Pl.'s Resp. 20.)  Importantly, however, although the November 2012 incident indisputably caused problems at the Fitness Center, this incident was not referenced in either the Letter of Disappointment or in DeLeon's email recommending termination. Therefore, Plaintiff's argument that Defendants lacked a basis in fact for terminating Plaintiff based upon this event is irrelevant. Also irrelevant, then, is whether Ms. Floyd and Ms. Jobbitt disciplined Ms. Thompson, the employee who allegedly instigated the November incident. (*Id.* at 13.)

Defendants until after the close of discovery. Nor does Plaintiff provide any indication that he offered to produce those notes during his termination meeting with DeLeon, Ms. Jobbitt, and Ms. Floyd. Plaintiff admitted during his deposition that documenting client progress was a duty of his position yet he failed to produce any evidence of his compliance with this duty at the time of the challenged adverse employment action.

Even assuming that Plaintiff has rebutted Defendants' proffered justification for his termination, the Court believes that this is one of those rare cases "where 'although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.'" *Philbrick*, No. 13-2569, 2014 U.S. App. LEXIS 18017, at *24 (quoting *Reeves*, 530 U.S. at 148, 120 S. Ct. at 2109). This is because Plaintiff has failed to present any evidence that either Ms. Floyd or Ms. Jobbitt acted on the basis of discriminatory animus or that they did not honestly believe in the proffered nondiscriminatory reason given for the employment action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998).

In this case, Plaintiff does not offer any evidence of gender discrimination by either Ms. Floyd or Ms. Jobbitt, the two decisionmakers who approved DeLeon's recommendation to terminate Plaintiff. Indeed, Plaintiff chose not to depose Ms. Jobbitt. That a female decisionmaker terminated a male may suffice to

23

show the background circumstances necessary to set forth a prima facie case,

*Zambetti*, 314 F.3d at 257, does not mean that it is sufficient to create a genuine

issue of fact with regard to the pretext inquiry.  Plaintiff argues that discrimination

is evidenced by the fact that the female decisionmakers did not review any female

employees' records, however, Plaintiff does not present evidence that either Ms.

Floyd or Ms. Jobbitt had any reason to review those records prior to Plaintiff's

termination.  The decisionmakers were in receipt of an email from DeLeon,

Plaintiff's direct supervisor, outlining several performance-related issues prior to

terminating Plaintiff.  Attached to this email were the Letter of Disappointment, as

well as the emails between Plaintiff and his co-worker regarding filling out the

group exercise log and Plaintiff's offer to stop teaching the group exercise classes

altogether.  There is nothing to suggest that the decisionmakers' reliance on these

documents was unreasonable.

When Plaintiff raised his concerns regarding the client progress notes at the

termination meeting, Ms. Floyd decided to investigate further.[12]  Ultimately, Ms.

Floyd reviewed Plaintiff's client files and compared the contents of those files with

the contents of five randomly selected female rehabilitation trainer client files.

(Floyd Dep. 28.)  Upon reviewing these files, Ms. Floyd corroborated DeLeon's

---

[12] It is not entirely clear whether the finality of Plaintiff's determination was dependent upon the results of Ms. Floyd's investigation.

assertion that Plaintiff was not adequately maintaining client files.[13] (*Id.* at 44.) Again, that Plaintiff kept some files on his personal iPad does not change the fact that Ms. Floyd did not see those files during the course of her investigation.

In this Court's view, the inference of sex discrimination that Plaintiff claims lacks evidentiary support and is based on speculation and conjecture. *Cf. Seoane-Vazquez v. Ohio State Univ.*, No. 13-3029, 2014 U.S. App. LEXIS 15865, at *37-38 (6th Cir. Aug. 18, 2014) (unpublished) ("Conspiratorial theories based on little more than speculation cannot save a claim from summary judgment."). There is no evidence that either Ms. Jobbitt or Ms. Floyd lacked an honest belief in the information they possessed at the time of the adverse action or at the time Ms. Floyd compared Plaintiff's client files with the files of the female rehabilitation trainers.

In short, even if female employees were spending more time with clients than they were supposed to or if they failed to fill out progress notes for their clients on a number of occasions, there is no indication that either female decision-maker lacked an "honest belief" in the nondiscriminatory basis upon which they made the employment decision or that they had any reason to suspect that DeLeon

---

[13] Plaintiff suggests that DeLeon, who brought Ms. Floyd the files to review, removed various documents from his client files. At the summary judgment stage, Plaintiff must present evidence beyond mere allegation.

made the recommendation upon such a basis.[14]  This precludes Plaintiff from establishing that the termination was pretextual.  *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it was ultimately shown to be incorrect.").  This is true even if the employer's "conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quotation omitted); *Blizzard*, 698 F.3d at 285 (noting that an employer's decisional process need not be optimal or leave no stone unturned).

This Court is unable to conclude that this case presents "sufficient evidence from which a jury could reasonably reject [Defendants'] explanation of why" Plaintiff was fired.  *Blizzard*, 698 F.3d at 285.  Stated differently, the Plaintiff has not adduced evidence from which a reasonable jury could find that Plaintiff's

---

[14] Although Plaintiff devotes great attention to how DeLeon treated him differently than the female rehabilitation trainers, Plaintiff does not argue that DeLeon's discriminatory bias influenced the decision made by Ms. Floyd or Ms. Jobbitt.  In other words, Plaintiff does not seek to impose liability pursuant to a "cat's paw" theory.  *See Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009) ("The 'cat's paw' theory refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse . . . decision, thereby hiding the subordinate's discriminatory intent.").  This is significant in light of the lack of any evidence (as opposed to speculative conclusions) suggesting that Ms. Floyd or Ms. Jobbitt acted with impermissible gender bias.

termination was the result of impermissible sex discrimination under either Title VII or the ELCRA.[15]  As such, Defendants are entitled to summary judgment on Plaintiff's reverse sex discrimination claims under both statutes.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the Court finds that Plaintiff has failed to discharge his burden of showing that there are disputed issues of material fact rendering summary judgment improper.  Defendants have demonstrated that judgment as a matter of law is appropriate as to each of Plaintiff's claims of discrimination.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss Based on the Pleadings and for Summary Judgment is **GRANTED** and that the present action is **DISMISSED WITH PREJUDICE**.

Dated: November 5, 2014

                                        s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:

**Scott W. Rooney, Esq.**
**George D. Mesritz, Esq.**

---

[15] As a result of this conclusion, the Court need not address the parties' remaining arguments about individual liability and contractually-shortened limitations periods.

27